**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

```
                              :
ROBERT BRISTOL,               :
                              :
     Plaintiff,               :
                              :    Case No. 2:15-cv-21
          v.                  :
                              :
CAROLYN W. COLVIN,            :
Commissioner of Social        :
Security Administration,      :
                              :
     Defendant.               :
                              :
```

## <u>Opinion and Order</u>

Plaintiff Robert Bristol brings the present action pursuant to 42 U.S.C. § 405(g) to challenge the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, denying his claim for disability insurance benefits. Currently before the Court are Bristol's motion to reverse the decision of the Commissioner (ECF No. 7), and the Commissioner's motion to affirm (ECF No. 11). For the reasons explained below, the Court **denies** Bristol's motion and **grants** the motion of the Commissioner. This case is therefore **dismissed.**

**BACKGROUND**

## I.   Procedural History

Bristol applied for Social Security disability insurance ("SSDI") benefits on September 17, 2012, alleging a disability that began on May 26, 2012.  A.R. 147.[1]  The application was denied initially on November 30, 2012, A.R. 82, and upon reconsideration on February 15, 2013, A.R. 92.  At Bristol's request, Administrative Law Judge ("ALJ") Thomas Merrill conducted a hearing on the matter on March 12, 2014.  A.R. 30. ALJ Merrill issued a decision denying Bristol's application on April 28, 2014.  A.R. 23.  On June 19, 2014, Bristol filed a request for review by the Appeals Council.  A.R. 5-6.  The Appeals Council denied Bristol's request on December 2, 2014, rendering ALJ Merrill's decision the final decision of the Commissioner.  A.R. 1.

## II.  Factual Background

### A. Non-Medical Evidence

At the time of the hearing in front of ALJ Merrill, Bristol was 38 years old and lived with his family in St. Johnsbury, Vermont.  A.R. 31, 190.  He obtained his GED in 1994, *id.*, and worked as a warehouse manager from 1996 until 2012, A.R. 168.

---

[1] "A.R." refers to the administrative record of proceedings filed by the Commissioner as part of her answer.

### 1. Bristol's Social Security Questionnaires

On October 28, 2012, Bristol filled out a disability questionnaire as part of his application for SSDI.  A.R. 190-97.  At that time, Bristol reported that he suffered from Meniere's disease, which caused him to undergo frequent attacks of dizziness, vomiting, and loss of balance.  A.R. 190.  He further indicated that he was bipolar, prone to anxiety and panic attacks, and that he experienced lower back pain, knee pain, and severe ringing in his ears.  *Id*.  In spite of those conditions, Bristol provided that he was able to take care of his baby while his wife was at work; help care for his children and the dog; manage his own personal care; handle money and go grocery shopping; and play with his children and visit with friends.  A.R. 191-94.  Bristol also reported that he could follow spoken and written instructions, finish the activities that he began, and get along with figures of authority.  A.R. 195.  Finally, Bristol indicated that he did not handle stress or changes in routine well and that he suffered from a fear of being alone.  A.R. 196.

Several months later, on January 16, 2013, Bristol again completed a questionnaire in connection with his request for reconsideration.  A.R. 207-14.  In the second questionnaire, he stated that he experienced episodes of extreme dizziness, vomiting, and loss of balance approximately three times per day,

3

with each episode lasting roughly two hours. A.R. 207. He also wrote that his back problems made it painful for him to bend and lift objects, and that his anxiety limited his ability to leave his house. *Id*. According to Bristol, when he was not suffering from the symptoms of Meniere's disease, he could care for his children, tidy the house, drive a car, and go grocery shopping with his wife. A.R. 208-10. He also reported that he could manage his own personal care, follow spoken and written instructions, pay attention normally, finish the activities that he began, and get along with authority figures. A.R. 209-13. Finally, Bristol reiterated that he did not handle stress well and that he feared being alone. A.R. 213.

### 2. Bristol's Testimony

At the hearing before ALJ Merrill on March 12, 2014, Bristol testified that he continues to suffer from episodes of dizziness, vomiting, and loss of balance. A.R. 32. Bristol stated that he was initially diagnosed with Meniere's disease in his right ear, and that he attempted to treat his symptoms through both biweekly steroid injections and surgery. *Id*. He indicated that neither procedure was successful. A.R. 33. Bristol added that he was later diagnosed with Meniere's disease in his left ear as well, and that he also received surgery on that ear. *Id*.

According to Bristol's testimony, the onslaught of symptoms he experiences is highly sporadic. *Id*. He stated that on some days he endures three to five episodes, while on others, he undergoes none at all. *Id*. Bristol maintained that the length of the episodes also varies from 20 minutes to several hours. *Id*. When he experiences an attack, he provided, he cannot stand or keep his eyes open. A.R. 37. Bristol testified that he has medication for his symptoms, but that the medication causes him to become extremely tired and to fall asleep. A.R. 38.

With respect to his mental health, Bristol reported that he suffers from deep anxiety related to his Meniere's disease and that he prefers to stay close to home. A.R. 39. He stated that he saw a mental health expert for approximately six months regarding that issue, and that he takes two medications regularly. A.R. 40. In addition, Bristol provided that he has long experienced regular back pain and that he drinks alcohol with his wife roughly twice a month. A.R. 42.

### 3. Vocational Expert's Testimony

James T. Parker, a vocational expert who testified at the hearing, stated that Bristol's previous employment consisted of two distinct responsibilities. A.R. 44. First, Bristol primarily served as a warehouse supervisor. *Id*. Second, Bristol was responsible for operating a forklift. *Id*. According to Parker, Bristol's prior work as a warehouse

supervisor is defined by the Dictionary of Occupational Titles ("DOT") as light and skilled. *Id*. Parker further indicated that the DOT defines the operation of a forklift as medium exertion and semi-skilled. A.R. 44-45.

During Parker's examination, ALJ Merrill posed a hypothetical scenario in which Bristol could lift 50 pounds occasionally and 25 pounds frequently; stand and walk for six hours; sit for six hours; use his hands and feet to push, pull, and operate controls; and maintain his balance frequently. A.R. 45. The hypothetical also provided that Bristol could not be exposed to unprotected heights and hazardous machinery. *Id*. Under those circumstances, Parker indicated that Bristol would not be able to drive the forklift because he would be unfit to operate hazardous machinery. *Id*. Bristol would be able to perform the supervisory responsibilities of his warehouse supervisor position, however, as that role primarily involves the delegation of tasks to others. *Id*. In addition, Parker opined that Bristol would be able to work as an auto dealer, a janitor, or a groundskeeper. A.R. 46.

Under a second hypothetical scenario, ALJ Merrill changed the circumstances such that Bristol could sit for six hours and stand or walk for less than two hours. *Id*. If Bristol could not complete an eight-hour workday, Parker suggested that he would not be capable of maintaining any full-time job. A.R. 47.

6

Yet, if he could sit for six hours and stand or walk for a full two hours, Parker opined that Bristol would be able to engage in light or sedentary work. *Id.* Such work would include positions such as a production sorter, a tile inspector, and a telephone information clerk. A.R. 48. Finally, Parker indicated that if Bristol required two or three unscheduled 30 minute breaks throughout the day, in addition to regularly scheduled breaks, he would not be able to maintain any job at all. A.R. 49.

**B. Medical Evidence**

On November 24, 2010, Bristol checked into the emergency room at Northeastern Vermont Regional Hospital. A.R. 276. He reported that he had experienced a sudden episode of dizziness and vomiting three days prior, and that those symptoms had continued intermittently ever since. *Id.* Stanley Baker, M.D. conducted an examination and recorded a clinical impression of vertigo. A.R. 276-77. Dr. Baker gave Bristol 25 milligrams of Meclizine, which subjectively improved Bristol's condition. A.R. 276. Bristol was then released. A.R. 277.

On April 7, 2011, Bristol was seen at the Dartmouth-Hitchcock Medical Center for an "evaluation of ear symptoms of Tinnitus, fluctuating hearing loss and vertigo." A.R. 246. Bristol indicated that he had a five-year history of intermittent tinnitus in his right ear and a fluctuating loss of hearing. *Id.* He also reported that he had a six to seven-month

7

history of vertigo associated with his ear symptoms.  *Id*.  The vertigo involved both nausea and vomiting.  *Id*.  Bristol stated that he had been taking Meclizine, which he found useful for treating his symptoms.  *Id*.  Peter Dixon, P.A., recorded an impression of Meniere's disease and recommended that Bristol return for a review in three months.  A.R. 247.

Over a year later, on May 25, 2012, Bristol returned to the emergency room at Northeast Vermont Regional Hospital.  A.R. 278.  He reported that he had been diagnosed with Meniere's disease and indicated that he had just suffered an episode of dizziness, ringing in his ears, and vomiting.  *Id*.  Dr. Baker recorded clinical impressions of vertigo and Meniere's disease, and administered one liter of saline, four milligrams of Zofran, and 25 milligrams of Meclizine.  A.R. 278-79.  Bristol then indicated that his conditions had improved, and he was released after treatment.  A.R. 279.  He stopped working the next day.  A.R. 168.

On August 20, 2012, Bristol saw Daniel Morrison, M.D. at Dartmouth-Hitchcock Medical Center for an evaluation of his Meniere's disease.  A.R. 240-41.  Bristol informed Dr. Morrison that he had an 18-24 month history of episodic vertigo associated with tinnitus, pressure, and decreased hearing in his right ear.  A.R. 240.  Bristol also stated that approximately two months earlier, he had begun experiencing episodes of

hearing fluctuation and tinnitus in his left ear.  *Id.*  With
respect to the vertigo, Bristol reported that he typically
experienced dizziness two times per week for two to three hours
per episode.  *Id.*  The vertigo was accompanied by nausea and
vomiting.  *Id.*  After conducting a series of examinations, Dr.
Morrison diagnosed Bristol with bilateral Meniere's disease.
A.R. 241.  Dr. Morrison indicated that due to Bristol's previous
response to steroids, he was optimistic that intratympanic
steroid injections would be beneficial.  *Id.*  Bristol agreed to
the procedure, and the doctor administered the first injection
into his right ear.  *Id.*

     The following week, on August 29, 2012, Bristol returned to
Dartmouth-Hitchcock Medical Center for a follow-up examination.
A.R. 238.  Dr. Morrison recorded that Bristol had done well with
the first injection, having suffered only a few brief episodes
of vertigo during the past week.  *Id.*  Dr. Morrison proceeded to
administer another steroid injection into Bristol's right ear.
*Id.*

     On September 10, 2012, Bristol again saw Dr. Morrison at
Dartmouth-Hitchcock Medical Center.  A.R. 237.  Dr. Morrison
noted that Bristol showed signs of improvement, but that he
continued to suffer from short episodes of dizziness every few
days.  A.R. 238.  After consulting with Bristol, Dr. Morrison
delivered a third steroid injection to Bristol's right ear.  *Id.*

The doctor also signed a note certifying that Bristol was not able to continue working, having been disabled by Meniere's disease since June 2012.  A.R. 293.

Bristol returned to Dartmouth-Hitchcock Medical Center on September 24, 2012.  A.R. 235.  He again met with Dr. Morrison and reported that he had continued to suffer from dizzy spells twice daily for 10-15 minutes per episode.  *Id*.  Bristol indicated that the attacks were no longer accompanied by nausea or a spinning sensation, however, and were "not nearly as bad as they were in the past."  A.R. 236.  After completing his examination, Dr. Morrison concluded that the episodes described by Bristol were no longer consistent with Meniere's disease "and may be due to lack of coordination between various components of the balance system."  A.R. 237.  Dr. Morrison recommended that Bristol complete a course of vestibular rehabilitation exercises at home.  *Id*.

On November 7, 2012, shortly after submitting his application for SSDI, Bristol underwent a psychological evaluation at the direction of the Commissioner.  A.R. 284. During the examination, Dennis Reichardt, Ph.D. observed that Bristol was cooperative and alert, with "a high-strung but pleasant personality."  A.R. 286.  Dr. Reichardt further noted that although Bristol exhibited a tense mood and nervous energy, his thinking was logical and coherent, and he was "free of

perceptual distortions, delusions, and suicidal ideation." *Id*. Based on the evidence acquired during the evaluation, Dr. Reichardt concluded that Bristol suffered from symptoms of anxiety and depression. *Id*. He also noted that a diagnosis of bipolar disorder was feasible, and that Bristol's weakened physical state exacerbated his anxiety such that he had developed a panic disorder. *Id*. Those psychological issues notwithstanding, Dr. Reichardt opined that Bristol "would likely be working now if he could physically do so." *Id*.

In addition to the psychological evaluation, the Commissioner requested that Bristol undergo a physical examination with Fred Rossman, M.D. A.R. 289. Bristol saw Dr. Rossman on November 12, 2012. *Id*. According to Dr. Rossman's notes, Bristol reported a history of lower back pain, Meniere's disease, sleep apnea, bipolar disorder, alcoholism, depression, and anxiety. *Id*. Bristol explained that he experienced moderate pain in his back every day, but that on occasion, the pain increased sharply. *Id*. He further provided that his Meniere's disease had resulted in a loss of hearing of approximately 90% in his right ear and 40% in his left ear. *Id*. Bristol informed Dr. Rossman that he had been receiving steroid injections at weekly intervals, but that he stopped the treatment due to the side effects of the steroids. *Id*. Finally, Bristol indicated that he experienced episodes of loss

11

of balance and ringing in his ears approximately twice per week.
*Id.*  Such episodes were occasionally associated with nausea and
vomiting.  *Id.*

After conducting his examination, Dr. Rossman noted that
despite Bristol's claimed back pain, he did not appear "to
demonstrate any decreased mobility including his ability to flex
and extend as well as to ambulate through the office."  A.R.
292.  Dr. Rossman further noted that Bristol did not appear to
be in acute distress, and that Bristol indicated that he left
work due to his Meniere's disease, not his lower back pain.  *Id.*
With respect to Meniere's disease, Dr. Rossman concluded that
Bristol demonstrated no difficulty in hearing during their
conversation in the examination room.  *Id.*  The doctor also
stated that Bristol demonstrated no loss of balance during the
brief evaluation.  *Id.*  Dr. Rossman did not assess Bristol's
bipolar disorder, depression, or anxiety.  *Id.*

Two days later, on November 14, 2012, Bristol had x-rays
taken of his spine.  A.R. 294.  Upon reviewing the images,
Richard Bennum, M.D. recorded that "[t]here is mild hypertrophic
spurring of the vertebral endplates in the lower lumbar and
lower thoracic regions."  A.R. 295.  Dr. Bennum also concluded
that the intervertebral disc spaces appeared well maintained,
and that "no other bony abnormality is seen and there is no
evidence of fracture."  *Id.*

12

On November 16, 2012, Joseph Patalano, Ph.D. evaluated the record evidence regarding Bristol's psychological impairment for the purpose of assessing Bristol's initial SSDI application. A.R. 58.  Dr. Patalano concluded that Bristol "may have episodic problems with concentration/pace due to occasional increases in anxiety/depression associated with health and environmental stressors which temporarily undermine cognitive efficiency." A.R. 61.  Nonetheless, Dr. Patalano stated that from a psychological perspective, Bristol "can sustain concentration/persistence/pace for 2 hour periods over 8 hour day through typical work week."  *Id.*  Dr. Patalano further opined that Bristol was capable of routine collaboration with a supervisor and limited interaction with coworkers.  A.R. 62.

Moreover, on November 29, 2012, Social Security Single Decision Maker Maxwell Criden reviewed the record evidence with respect to Bristol's physical impairment in order to assess Bristol's initial application for SSDI.  A.R. 60.  Criden found that Bristol could occasionally lift 50 pounds; frequently lift 25 pounds; stand or walk for six hours in an eight-hour work day; and sit for a total of six hours in an eight-hour work day. A.R. 59.  Criden also found that Bristol's balance was limited and that he should avoid even moderate exposure to hazards such as machinery or heights.  A.R. 59-60.  Based on his assessment, along with that of Dr. Patalano, Criden ultimately determined

13

that although Bristol was limited to unskilled work due to his impairments, he was not disabled for the purpose of his SSDI application.  A.R. 63.  Elizabeth White, M.D. and Roy Shapiro, Ph.D. agreed with the conclusions of Criden and Dr. Patalano when considering Bristol's request for reconsideration.  A.R. 66-78.

On May 3, 2013, Dr. Morrison completed a questionnaire indicating that he was treating Bristol for Meniere's disease. A.R. 310.  He reported that Bristol "continue[d] to experience balance difficulties," which were "responding to treatment." *Id.*  In addition, he indicated that Bristol could stand or walk for less than two hours before suffering from dizziness or disorientation to the point of distraction.  *Id.*  He also provided that Bristol's condition was aggravated by movements of the head and movements of visual images on a computer or television screen.  A.R. 311.  Dr. Morrison noted that Bristol had suffered from such limitations since the beginning of his treatment.  *Id.*

Several months later, on September 3, 2013, Bristol saw Deane E. Rankin, M.D. at Littleton Regional Healthcare.  A.R. 315.  Bristol informed Dr. Rankin that Dr. Morrison had previously diagnosed him with Meniere's disease.  *Id.*  Although his symptoms had subsided for some time, Bristol indicated that recently, he had redeveloped vertigo, nausea, and fluctuating

14

hearing.  *Id.*  Dr. Rankin performed a general examination and recommended that Bristol follow up with Dr. Morrison.  A.R. 315-16.

On February 14, 2014, Dr. Morrison performed endolymphatic sac decompression surgery in Bristol's left ear.[2]  A.R. 326.  Following surgery, it was noted that Bristol was "doing well without problems."  A.R. 327.

## DISCUSSION

### I.   Standard of Review

A district court may reverse the Commissioner's determination that a claimant is not disabled "only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Carter*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)).  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. NLRB*, 302 U.S. 197, 229 (1938)).

In assessing whether substantial evidence supports the Commissioner's decision, "the Court [must] carefully consider[] the whole record, examining evidence from both sides."  *Tejada*

---

[2] Bristol submits that he also underwent endolymphatic sac decompression surgery in his right ear sometime after February 8, 2013.  *See* ECF No. 7 at 5.  Although there are no direct medical records of that procedure, there are two records that reference such surgery.  *See* A.R. 315, 330.

*v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).  The Court may not,
however, "'substitute its own judgment for that of the
[Commissioner], even if it might justifiably have reached a
different result upon a de novo review.'"  *Jones v. Sullivan*,
949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of
Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

## II.  The Definition of Disability

The Social Security Act provides that an individual is
disabled when he is unable "to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).
The impairment must be "demonstrable by medically acceptable
clinical and laboratory diagnostic techniques," § 423(d)(3), and
must be "of such severity that [the applicant] is not only
unable to do his previous work but cannot, considering his age,
education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy,"
§ 423(d)(2)(A).

Pursuant to agency rules promulgated under the Act, the
Commissioner is to apply a five-step analysis in determining
whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520,

16

416.920.  The Second Circuit has articulated that analysis as

follows:

> 1. The Commissioner considers whether the claimant is
>    currently engaged in substantial gainful activity.
> 2. If not, the Commissioner considers whether the
>    claimant has a 'severe impairment' which limits his
>    or her mental or physical ability to do basic work
>    activities.
> 3. If the claimant has a 'severe impairment,' the
>    Commissioner must ask whether, based solely on
>    medical evidence, claimant has an impairment listed
>    in Appendix 1 of the regulations.  If the claimant
>    has one of these enumerated impairments, the
>    Commissioner will automatically consider him
>    disabled, without considering vocational factors
>    such as age, education, and work experience.
> 4. If the impairment is not 'listed' in the
>    regulations, the Commissioner then asks whether,
>    despite the claimant's severe impairment, he or she
>    has residual functional capacity to perform his or
>    her past work.
> 5. If the claimant is unable to perform his or her past
>    work, the Commissioner then determines whether there
>    is other work which the claimant could perform.  The
>    Commissioner bears the burden of proof on this last
>    step, while the claimant has the burden on the first
>    four steps.

*Shaw v. Carter*, 221 F.3d 126, 132 (2d Cir. 2000) (internal

citation omitted).  Under the third step, the Second Circuit has

made clear that the irrebuttable presumption of disability

applies so long as the claimant has an impairment that is

"listed" or an impairment that is "equal to" a listed

impairment.  *Id.; see also* 20 C.F.R. §§ 404.1520(d), 416.920(d).

**III. The ALJ's Decision**

In a written decision dated April 28, 2014, ALJ Merrill

applied the five-step analysis explained above in determining

17

whether Bristol was disabled.  A.R. 12-23.  ALJ Merrill began by finding that Bristol had not engaged in substantial gainful employment since May 26, 2012, the date of the alleged onset of disability.  A.R. 12.  He next found that Bristol suffered from the following "severe" impairments: Meniere's disease, degenerative disc disease of the lumbar spine, affective disorder/bipolar disorder, anxiety/panic disorder, and alcohol addiction disorder.  A.R. 13.  Under step three, ALJ Merrill considered whether Bristol's impairments met or medically equaled Listing 1.04, 2.07, 12.04, 12.06, or 12.09 in 20 C.F.R. Part 404, Subpart P, Appendix 1.  A.R. 14.  He concluded that Bristol's impairments did not meet or medically equal any of those listings.  A.R. 13.

ALJ Merrill then made a determination regarding Bristol's residual functional capacity.  A.R. 16-21.  Based on the record evidence, ALJ Merrill found that Bristol had the capacity to lift 50 pounds occasionally and 25 pounds frequently; stand or walk for six hours in an eight-hour workday; and sit for six hours in an eight-hour workday.  A.R. 16.  ALJ Merrill also found that Bristol had unlimited use of his hands and feet to operate controls and to push and pull.  *Id*.  He further determined that Bristol could frequently balance, and that he was capable of routine collaboration with supervisors and routine interaction with coworkers.  *Id*.  Finally, ALJ Merrill

found that Bristol should avoid even moderate exposure to unprotected heights and hazardous machinery. *Id*.

In light of those findings, ALJ Merrill found under step four that Bristol was capable of performing his past relevant work as a warehouse supervisor. A.R. 21. ALJ Merrill acknowledged Bristol's indication that his prior job required him to stand and walk for eight hours per day and lift objects weighing more than 100 pounds, yet the ALJ noted that DOT defines the position as a "medium duty job." A.R. 22. Accordingly, ALJ Merrill found that Bristol would be able to perform the job as it is generally performed in the economy. *Id*.

Despite having determined that Bristol was capable of engaging in his prior position, ALJ Merrill continued to step five of the analysis to assess whether there were other jobs in the national economy that Bristol would be able to perform. *Id*. Relying on the testimony of vocational expert James Parker, ALJ Merrill found that Bristol would be able to perform the responsibilities of several occupations, including those of an automobile dealer, a janitor, and a groundskeeper. A.R. 23. He also accepted Parker's testimony that each of those positions exists in significant numbers in the national economy. *Id*.

In making his findings regarding Bristol's residual functional capacity, ALJ Merrill credited the reports of

physical and psychological consultative examiners Fred Rossman, M.D. and Dennis Reichardt, Ph.D.  A.R. 17-18.  He also placed significant weight on the opinions of non-examining state agency medical consultant Elizabeth White, M.D. and non-examining state agency psychological consultants Joseph Patalano, Ph.D. and Roy Shapiro, Ph.D.  A.R. 20.  He relied on the opinions of the non-examining consultants because those individuals are familiar with the rules and regulations of the Social Security disability program, and because their conclusions were consistent with those of the consultative examiners and the record evidence. A.R. 20-21.

By contrast, ALJ Merrill gave little weight to Dr. Morrison's opinion that Bristol was unfit to work.  A.R. 21. Although ALJ Merrill recognized that Dr. Morrison was one of Bristol's treating physicians, he found that the doctor's conclusion was unsupported by a detailed articulation of medical reasoning and inconsistent with other record evidence.  *Id.* Similarly, ALJ Merrill discounted Bristol's own account of his symptoms on the grounds that his claimed physical limitations were contradicted by other evidence in the record.  A.R. 18-21. Specifically, ALJ Merrill noted that Bristol collected unemployment compensation during the first two years of his alleged disability, which required him to sign documents indicating that he was actively seeking gainful employment, and

that he was ready, willing, and able to work.  A.R. 19.  ALJ
Merrill further found that Bristol's claimed limitations were
inconsistent with the results of the physical examination
performed by Dr. Rossman, as well as the interpretation of the
spinal radiograph offered by Dr. Bennum.  A.R. 19-20.  Finally,
ALJ Merrill determined that the activities in which Bristol
continued to engage--including personal tasks, family care, and
recreation--belied his allegations of total disability.  A.R.
20.

Bristol now submits that ALJ Merrill erred in three ways.
First, Bristol contends that ALJ Merrill failed to consider
whether his medical impairments equaled Listing 2.07 of 20
C.F.R. Part 404, Subpart P, Appendix 1.  Second, Bristol asserts
that ALJ Merrill's finding regarding his residual functional
capacity did not account for the time that he would be off task
due to vertigo attacks.  Third, Bristol argues that ALJ
Merrill's residual functional capacity finding failed to account
for Bristol's moderate limitations in concentration,
persistence, or pace due to depression and anxiety.  The Court
will address each argument in turn.

## IV.  Analysis

### A. Whether Substantial Evidence Supports the Finding that Bristol's Meniere's Disease Does Not Equal Listing 2.07

Bristol concedes that his Meniere's disease cannot meet the criteria for Listing 2.07 because he has not provided results from any caloric or other vestibular tests.  Nonetheless, he contends that ALJ Merrill erred in concluding that his impairment does not medically equal Listing 2.07.[3]  In support of his position, Bristol asserts that the record demonstrates a history of progressive hearing loss and frequent episodes of balance disturbance and tinnitus.  The Commissioner responds that substantial evidence supports ALJ Merrill's determination.

Listing 2.07 covers "disturbance[s] of [the] labyrinthine-vestibular function," which specifically include Meniere's disease.  20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 2.07.  In order to meet the criteria for Listing 2.07, an individual must demonstrate "a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing." *Id.*  An individual must also show both a "disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests;" and "hearing loss established by audiometry."  *Id.*

---

[3] Bristol also makes the unsupported assertion that "ALJ Merrill makes no finding as to whether Plaintiff 'equals' listing 2.07."  ECF No. 7 at 10. Bristol's argument is quickly dismissed, however, as ALJ Merrill plainly states in his written decision that Bristol "does not have an impairment or combination of impairments that meets or *medically equals* the severity of one of the listed impairments . . . ."  A.R. 13 (emphasis added).

Here, having carefully considered the entire record, the
Court finds that substantial evidence supports ALJ Merrill's
determination that Bristol's impairment does not medically equal
Listing 2.07.  To begin, ALJ Merrill found that Bristol had not
experienced a progressive loss of hearing.  Rather, ALJ Merrill
determined that Bristol had suffered "low frequency mild
sensorineural hearing loss" in his right ear, and that hearing
in his left ear was "within normal limits."  A.R. 14.  The
evidence in the record supports that determination.  As cited by
ALJ Merrill, an audiologic evaluation conducted in April 2011
revealed that Bristol had experienced mild hearing loss in his
right ear and that hearing in his left ear was within normal
limits.  A.R. 232.  Over a year later, in August 2012, a similar
evaluation indicated that Bristol had suffered moderate to mild
hearing loss in his right ear and that hearing in his left ear
remained within normal limits.  A.R. 234.  At that time, Dr.
Morrison opined that Bristol's hearing had actually improved as
compared to previous test results.  A.R. 241.  A report written
by Dr. Rossman in November 2012 further provided that Bristol
"demonstrate[ed] no difficulty in hearing during the
conversation in the exam room which [was] in a relatively small
room and small space but without need to raise one's voice."
A.R. 292.

Next, ALJ Merrill found that Bristol had not demonstrated a history of frequent attacks of balance disturbance and tinnitus. A.R. 14.  The evidence in the record also supports that determination.  As ALJ Merrill noted, in April 2011, Bristol reported that three weeks had passed in between episodes of tinnitus.  A.R. 246.  Although Bristol later testified during the hearing that he suffered between three and five episodes per day, A.R. 33, other record evidence belies such a high frequency of attacks.  Specifically, medical reports from both August and November 2012 provide that Bristol reported experiencing only two episodes of vertigo per week.  A.R. 240.  In addition, the record makes clear that Bristol responded positively to medical treatment.  After receiving a series of steroid injections in August and September 2012, Bristol reported that his episodes of lightheadedness no longer included nausea or a spinning sensation, and were "not nearly as bad as they were in the past."  A.R. 236.  Indeed, Dr. Morrison concluded during that examination that "[t]he episodes that [Bristol] is describing now are not consistent with Meniere's [disease]."  A.R. 237.

Based on the medical records described above, the Court finds that substantial evidence supports ALJ Merrill's determination that Bristol did not demonstrate "a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing."  *See* 20 C.F.R. Part 404, Subpart

24

P, Appendix 1, Listing 2.07.  Accordingly, the Court rejects the

argument that ALJ Merrill erred in concluding that Bristol's

impairment does not medically equal Listing 2.07.[4]

### B. Whether Substantial Evidence Supports the RFC Finding in light of Bristol's Episodes of Vertigo and Tinnitus

Bristol next submits that ALJ Merrill erred in determining

Bristol's residual functioning capacity ("RFC") by failing to

account for episodes of vertigo and tinnitus during which he is

unable to work.  In response, the Commissioner argues that ALJ

Merrill's RFC finding is supported by substantial evidence.

The Court agrees with the Commissioner's argument.  In

determining Bristol's RFC to perform medium work, ALJ Merrill

recognized "the somewhat sporadic nature of [Bristol's] attacks

of symptoms of Meniere's disease."  A.R. 17.  Nonetheless, ALJ

Merrill noted that although he did not witness an attack,

physical consultative examiner Dr. Rossman "indicated no

objective medical signs or symptoms that would suggest [Bristol]

was suffering under significant physical functional limitation."

*Id*.  Indeed, with respect to Bristol's Meniere's disease, Dr.

Rossman reported that Bristol "demonstrate[d] no difficulty in

hearing" in the small examination room, and that he

---

[4] Bristol also argues that ALJ Merrill erred by failing to further develop the record by calling a medical expert to address the question of medical equivalence.  Bristol's argument cannot succeed, however, because where, as here, "there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)).

"demonstrate[d] no loss of balance during the short episode of walking into or out of the office [or during] his demonstration of his ability to walk during the examination." A.R. 292. Dr. Rossman further indicated that Bristol "appear[ed] responsive and communicative and able to hear questions asked and answer questions appropriately." *Id*. Non-examining medical consultant Dr. White arrived at similar conclusions, opining that Bristol is fit to stand for a total of "[a]bout 6 hours in an 8-hour workday;" sit for a total of "[a]bout 6 hours in an 8-hour workday;" and balance "[f]requently." A.R. 74.

Beyond the observations of Dr. Rossman and the opinions of Dr. White, ALJ Merrill also relied upon Bristol's daily activities in determining his RFC. As ALJ Merrill noted, Bristol reported that he was able to take care of his baby while his wife was at work, as well as drive a vehicle. A.R. 191-93. A hospital report further indicated that Bristol continued to use his snowmobile long after he first began to experience symptoms of Meniere's disease. A.R. 324. Although not all of Bristol's daily activities are inconsistent with a disability, caring for a child and operating motorized vehicles undeniably conflict with Bristol's subjective complaints. *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009).

Finally, ALJ Merrill noted that Bristol has responded well to treatment. As stated above, after performing a series of

steroid injections in the fall of 2012, Dr. Morrison indicated that "[t]he episodes that [Bristol] is describing now are not consistent with Meniere's [disease]." A.R. 237.  Although Bristol's symptoms reportedly returned sometime thereafter, in February 2014, Bristol underwent left endolymphatic sac decompression surgery.  A.R. 326.  The medical reports indicate that Bristol was "doing well" immediately after surgery, and there is no evidence in the record suggesting that Bristol has required any significant treatment since the February 2014 procedure.  A.R. 327.

In light of the reports of Dr. Rossman and Dr. White, as well as Bristol's own daily activities and his response to treatment, the Court finds that ALJ Merrill's RFC finding is supported by substantial evidence.  Consequently, the Court cannot accept Bristol's argument that ALJ Merrill failed to adequately consider his vertigo and tinnitus.

### C. Whether Substantial Evidence Supports the RFC Finding in light of Bristol's Limitations in Concentration, Persistence, and Pace

Lastly, Bristol argues that ALJ Merrill erred in determining Bristol's RFC by failing to account for his moderate limitations in concentration, persistence, and pace.  In support of his position, Bristol points to the opinions of non-examining psychological consultants Joseph Patalano, Ph.D. and Roy Shapiro, Ph.D.  As Bristol asserts, both doctors indicated that

27

Bristol "may have episodic, problems with concentration/pace due to occasional increases in anxiety/depression associated with health and environmental stressors which temporarily undermine cognitive efficiency." A.R. 61, 76. Given those indications, Bristol submits that ALJ Merrill's RFC determination is not supported by substantial evidence.

Bristol's argument cannot succeed. First, as the Commissioner asserts, the reports of Dr. Patalano and Dr. Shapiro do not conclude with the doctors' opinions regarding Bristol's episodic limitations in concentration and pace. Rather, both doctors proceed to state that outside of those episodic limitations, from a psychological perspective, Bristol can sustain concentration, persistence, and pace for two-hour periods over eight-hour days throughout a typical work week. *Id*. When considering the breaks afforded in an average workday, such opinions are consistent with ALJ Merrill's finding that Bristol's psychological limitations do not render him totally disabled.

Second, other evidence in the record further supports ALJ Merrill's assessment of Bristol's psychological capacity. As ALJ Merrill noted in his written decision, psychological consultative examiner Dennis Reichardt, Ph.D. reached the conclusion that Bristol experienced symptoms of anxiety and depression. Those symptoms notwithstanding, Dr. Reichardt

28

opined that Bristol "would likely be working now if he could physically do so." A.R. 286. Dr. Reichardt's opinion plainly suggests that Bristol's mental health does not prevent him from engaging in work. Moreover, Bristol's own responses to the Social Security questionnaires indicate that his limitations in concentration, persistence, and pace are not fully debilitating. In the October 2012 questionnaire, Bristol indicated that he could finish what he started. A.R. 195. Similarly, in the January 2013 questionnaire, Bristol reported that he could finish what he started and pay attention normally. A.R. 212. Those indications also support ALJ Merrill's RFC finding.

Thus, based on the full reports of Dr. Patalano and Dr. Shapiro, as well as the conclusions of Dr. Reichardt and Bristol's own statements regarding his ability to concentrate, the Court finds that ALJ Merrill's RFC finding is supported by substantial evidence. Consequently, the Court rejects Bristol's argument that ALJ Merrill failed to properly account for Bristol's psychological limitations in determining his RFC.

### CONCLUSION

As set forth above, the Court **denies** Bristol's motion to reverse the decision of the Commissioner (ECF No. 7), and **grants** the Commissioner's motion to affirm (ECF No. 11). The present case is therefore **dismissed.**

Dated at Burlington, in the District of Vermont, this 3rd day of June, 2016.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge